UNITED STATES STAMPING Co. *v.* JEWETT, President, etc.

*(Circuit Court, N. D. New York.* November 29, 1880.)

1. PATENT No. 119,705—CUSPIDORS—VALIDITY—INFRINGEMENT.

Letters patent No. 119,705, granted October 10, 1871, to Eugene A. Heath, for a metallic cuspidor in form essentially a spheroidal body, with conical mouth flaring outwards, formed of three metallic parts, the lower being heavier, and the middle and upper being lighter, than in then-existing devices, the lower part extending up to the longest diameter of the spheriod, the middle part of a dome shape, and joined to the upper and lower parts, the upper part being an inverted cone, forming a mouth, the whole not being liable to fracture, and having the capacity of returning to an upright position of itself, from a position not upright, when left free, *held valid* and *infringed.*

2. PATENT—ASSIGNMENT—LEGAL TITLE.

> The assignment of the interest in an invention prior to the issue of a patent therefor, vests in the assignee the legal title to the property created thereby, upon recording the assignment thereof in the patent office, even though the patent may be issued to the patentee or assignor.

*Frederic H. Betts,* for plaintiff.

*Charles F. Blake,* for defendant.

BLATCHFORD, C. J.    This suit is brought for the alleged infringement by John C. Jewett & Sons, a joint stock association, of letters patent No. 119,705, granted to Eugene A. Heath, October 10, 1871, for an improvement in cuspidors. The patent was held to be valid by the decision of this court in the case of the same plaintiff against King, in August, 1879. In a prior suit in the circuit court for New Jersey it had been held by Judge Nixon to be invalid. That suit was brought by Linn Ingersoll, the then owner of the patent, against Mary Turner and William Turner, for infringement. In that suit it was held that the Heath invention was anticipated by an invention made by William H. Topham, and for which he obtained a patent August 2, 1870. The date of the Heath invention was not carried back, in that suit, prior to the date of the Heath patent; but in the King suit, in this court, it was shown that Heath applied for his patent before Topham made his invention. Various other defences were set up in the King case, and were overruled. In the present case some defences are brought forward which were not made in the King case, or in the Turner case.

The principal new defence is the alleged prior invention of the same thing by Charles T. Weber, in Chicago. Before considering the date of the Weber invention it is necessary to fix the date of the Heath invention. In the King case the Heath invention was defined to be a metallic cuspidor, in form essentially a spheroidal body, with a conical mouth flaring outwards, formed of three metallic parts, the lower part being heavier than in ordinary, then-existing cuspidors, and extending up to the longest diameter of the spheroid,—the middle part and the upper part being lighter than in then-

existing cuspidors; the middle part being of a dome shape, and being joined below to the lower part, and above to the upper part, and the upper part being an inverted cone in shape, flaring outwards and forming a mouth; the whole structure not being liable to fracture, and having the capacity of returning to an upright position, of itself, from a position not upright, when left free.

Heath testifies that he made his invention in the fall of 1869. What he meant by this is shown by the testimony of his brother, who says that in the early fall of 1869 Heath spoke to him about a metallic loaded cuspidor, to be made in three pieces, joined at the neck and at the swell, as to how it would sell, and showed him a drawing of the shape of it on paper. He experimented thereafter as to the shape and the mode of putting the pieces together with a view to cheapness of construction. In the fall of 1869, or in the spring or summer of 1870, he made a cuspidor of different pieces of tin wrought up by hand, with a piece of lead soldered on the inside of the bottom, to make the structure self-righting. This one seems to have been made of three parts, joined at the greatest and the least diameter, although each part consisted of more than one piece of tin. During the year 1870 he made a large number of these tin cuspidors experimentally, with a view of arriving at the cheapest manner of getting the desired shape from the smallest number of pieces of sheet metal. Sometime in the summer or fall of 1870 he made a loaded cuspidor of three pieces of metal, joined at the greatest and the least diameter, on a Grimshaw press, which he procured in July, 1870. This was without any vertical seams, and was substantially the patented structure. It took about a year after that to get the necessary machinery to make the articles for the market. The patent was applied for June 3, 1871, and the first cuspidors sold were delivered June 8, 1871. On this evidence, the date of the Heath invention is properly to be taken as the fall of 1869, or early in 1870. After conceiving the idea of the shape of the structure, and the making it of metal with seams at the greate t and the least diameter, he exercised reasonable dili-

gence in embodying his ideas in a structure, and in perfecting it so as to make it of the fewest possible number of pieces and get rid of vertical seams, and enable it to be made cheaply by machinery.

The evidence on the part of the defendant, as to the Weber structure, is very voluminous. I have examined it with great care, and the result is that I am not satisfied from it that the defendant has fulfilled the necessary obligation of showing, beyond any reasonable doubt, that Weber was prior to Heath. In all the testimony for the defendant there is not the fixing of a date, for the Weber invention, by evidence of such a character as makes it impossible that such date should not have been earlier than the date of Heath's invention. The defendant's witnesses testify from abstract memory of dates, or from some associations in their minds, which, on being tested, prove unsubstantial, and not to be relied on. It would occupy too much space to discuss the evidence in detail. Some of the salient features will be adverted to.

Weber, the alleged prior inventor, was an employe in the establishment of Creror, Adams & Co., of Chicago, at the time. Mr. J. McGregor Adams, of that firm, was the person who first brought before the court, by an affidavit made by himself, this structure of Weber. The evidence taken as to this structure was taken in consequence of statements made in this affidavit of Mr. Adams. It now turns out that the statements hazarded from memory in this affidavit of Mr. Adams were very largely erroneous. They placed events earlier than they turned out to be on investigation. They did so as to the time when the firm of Creror, Adams & Co. was formed, as to the time when the Chicago Railway Lantern Company succeeded it, and as to the time when Weber left his employ. They were erroneous as to the fact of the making of self-righting spittoons by his firm prior to the making of the cuspidor in question; as to the fact of the purchasing of self-righting cuspidors from his firm by the Pullman Palace Car Company, the Chicago & Northwestern Railroad Company, and Mason & Co.; and as to the witnesses who would corroborate his statement as to the prior invention by

Weber. These circumstances are alluded to as evincing a tendency on the part of Mr. Adams, honest and sincere though it may be, to remember things which did not occur, and to place events which did occur at an earlier date than they actually occurred. Such a habit of mind, in the presence of the affidavit made by him; and of the fact that he took an active and zealous part in the procuring of the witnesses who testified for the defendant; and of the fact that many of such witnesses were or had been his employes; and of the fact that they, and others of the witnesses, were in a position naturally to respond to his influence upon their memories in a direction consonant with his own memory, in a matter which for them had no interest, but for him had an interest to be measured only by the positiveness of his assertions in his affidavit,—such a habit of mind is to be taken into consideration when weighing his own evidence, and that of such other witnesses, as to the date of the Weber structure. The testimony of Mr. Adams as to the sale of the Weber cuspidors to anybody is entirely vague and unreliable. It is not supported by any written or record evidence, or by any testimony from the alleged purchasers. His dates of events, in his testimony, are shown to be as unreliable as his dates in his affidavit.

As to one of the Weber cuspidors which Mr. Adams had in his house, given to him by Weber, Mr. Adams states, in his testimony, that he had it in his family as early as 1868,—probably, he says, the first of January, 1868,—and that it was a New Year's present to aid in furnishing a new library, completed in 1867. Mrs. Adams, his wife, testifies that this Weber cuspidor was brought to her house in 1867 or 1868, after the library was completed, and two years certainly before she went to Europe, which was July 12, 1870; that she connected it with another gift which was received about the same time— a fire-screen—given by Mr. John Dow, the screen being a cutglass one, in which the cuspidor was reflected; that the cuspidor was also reflected in a mirror and in the windows of a book-case; and that, the room appearing to be full of cuspidors, the article was sent into the attic. Miss King, Mrs. Adams' daughter, who lived in Mr. Adams' family from 1866

to 1870, says that she saw the Weber cuspidor there between 1868 and 1870, in the library, where the glass screen presented by Mr. Dow was at the time. Mr. Dow testifies that he gave the glass screen to Mrs. Adams at Christmas of 1868. On cross-examination he was asked what made him sure of that date, and he said, "collateral evidence,"—the collateral evidence being that the family went abroad in May, 1869, and remained away over a year, and it could not have been Christmas of 1869. Now, it clearly appears that the Adams family went abroad in July, 1870; so the screen must have been given at Christmas of 1869, and the cuspidor appeared in the house after the screen did.

Mr. Dow attempts to fix another date by association. He says that in November, 1869, he took rooms at the Tremont House, in Chicago, and put one of the Weber cuspidors into them. On cross-examination, he says that he first went to the Tremont House to live while Mr. Adams was abroad. Then, when he finds that Mr. Adams was not abroad in November, 1869, he says that Mr. Adams was not abroad when he was living at the Tremont House. Such testimony proves nothing. The two young Webers give no reliable data for fixing a date earlier than Heath's invention. The older Weber is very confused as to dates, and gives nothing reliable; and his recollection that he made the cuspidors six months before the flower-stand was made would carry the date of the cuspidors back to 1866—an impossible date on all the evidence. Muller gives no adequate reason for any date he fixes, nor does Meyer. As to the cuspidors said to have been put into the Chicago & Alton pay car, and the two put into Nolton's house, there is nothing in the testimony of Rice or Nolton, or Mrs. Nolton, or Corning which gives a reliable date earlier than that of Heath. The plaintiff gives reliable evidence from the railroad books that the pay car cuspidors were not earlier than June, 1871. Heinze gives no adequate reason for the date of 1868, nor does Broderick. Shay does not aid the defendant's case. Frost's reason for assigning a date before May, 1869, failed on his cross-examination. Gray, Westlake, and Covert furnished nothing satis-

factory. Not a Weber cuspidor shown to have been made before the Chicago fire of 1871 is produced. The Nolton cuspidor is not one.

The alleged prior invention of Musgrove was held, in the King case, to have been an abandoned experiment, and it was not a loaded cuspidor. Musgrove himself took a license under the Heath patent. He did not, when sued, set up what he did as any prior invention. The suggestion by the defendant that all Heath did was to put Topham's weight into Musgrove's structure, is based on the fact that it is now shown that Topham made his *papier mache* loaded spittoon in the summer of 1869. But Musgrove's structure never became, in his hands, a perfected structure. The reasons why Heath's invention is to be regarded as patentable, notwithstanding all that was done before by Topham and all others in the way of perfected inventions, were fully set forth in the decision of this court in the King suit.

Another defence urged in this case is that as Ingersoll sued the Turners, and the Turners set up the Topham patent as prior, and had a license under it, and succeeded in the suit, and Jewett & Sons now have a license under the Topham patent, the plaintiff cannot prevail in this suit, on the ground that it is bound in the decree in the Turner suit, because Topham was privy to the Turners. This view is based on the allegation that Topham was really the defendant in the Turner suit, and that Topham, and, through him, Jewett & Sons, in this suit, would have been bound by the decree in the Turner suit, if the decree therein had been for the plaintiff. But it is very clear that Topham was not, in a legal sense, a party or a privy in the Turner suit. Topham's license to the Turners contained no obligation on his part to indemnify them, or to defend suits against them. He afterwards volunteered to pay the expense of defending them in the Ingersoll suit, and did pay it. He was not, and did not, become in any way responsible for any recovery against them in that suit. Clearly, under such circumstances, a decree against the Turners in that suit would not have availed to prevent Jewett & Sons from setting up in this suit a defence

based on the Topham invention and patent. That being so, a contrary decree in the Turner suit cannot avail Jewett & Sons as against the plaintiff in respect to the Topham matters. These remarks are made on the assumption that something more could be looked into in the Turner suit than what appears in the decree, namely, the simple dismissal of the bill. But no decision is made as to whether such assumption is well founded or not, or as to whether, if anything except such dismissal could be looked at, the suit could be regarded as involving any question as to the validity of the Topham patent, or any other question than the prior existence, in what Topham did, of what Heath did, or as to whether a patentee who has failed to recover against one alleged infringer could be thereby barred from recovering against another alleged infringer, under any circumstances.

The application of Heath was filed June 3, 1871. The patent was issued to him October 10, 1871. On the twentieth of July, 1871, he executed and delivered an assignment to the Heath & Smith Manufacturing Company, which assignment was not recorded in the patent-office until the eighteenth of November, 1871. The plaintiff has the title conveyed by that assignment, and it is that title which is set up in the bill. That assignment recites the making of the invention, and of the application for the patent and its allowance. It then states that said company had agreed "to purchase from me all the right, title, and interest which I have or may have in and to the said invention in consequence of the grant of letters patent therefor." The "said invention" had before been named in the assignment as an "invention" in "metallic cuspidors." In the petition for the patent the invention is spoken of as an improvement in "metallic cuspidors." The assignment then transfers to the company "the full and exclusive right to all the improvements made by me, as fully set forth and described in the specification which I have prepared and executed preparatory to the obtaining of letters patent therefor." It also says: "I do hereby authorize and request the commissioner of patents to issue said letters patent to the said the Heath & Smith Manufacturing Com-

pany, as the assignee of my whole right and title thereto, for the sole use and behoof of the said the Heath & Smith Manufacturing Company, and their legal representatives." On the twenty-seventh of May, 1872, Heath executed and delivered to one James P. Decker an assignment, which was recorded in the patent-office June 1, 1872. It recites the issuing of the patent, the execution by Heath of the said paper of July 20, 1871, and its receiving; alleges that it was obtained from him "by false representations, and without any consideration," and declares it void; and then conveys to Decker "all the right, title, and interest which I have in the said invention as secured to me by said letters patent; the same to be held and enjoyed by the said James P. Decker for his own use and behoof, and for the use and behoof of his legal representatives, to the full end of the term for which said letters patent are granted, as fully and entirely as the same would have been held and enjoyed by me if this assignment and sale had not been made."

The defendant contends that the language of the paper of July 20, 1871, does not convey the legal title to the patent, but only seeks to take advantage of the provision of section 33 of the act of July 8, 1870, (18 U. S. St. at Large, 202,) which provides for the issuing of patents to the assignee of the inventor, the assignment being first entered of record in the patent office; that it does not convey the right to the invention itself, but only the right to have the patent issued to the company on first recording the assignment; that, as the company allowed the patent to issue to Heath, its title to the patent was only an equitable title, and that, as Decker has the legal title, he is a necessary party to the bill. The answer does not set up that Decker should be added as a party, but it avers only that the plaintiff does not own the patent, and has no right to bring this suit, and that the patent is owned and held by Decker.

The only difference between this case and that of *Sayler* v. *Wilder*, 10 How. 477, is that, in that case, the assignment by Fitzgerald, the inventor, was recorded in the patent-office before the patent was issued. But the patent was issued to

Fitzgerald. It was held that the assignment conveyed the legal title to the patent afterwards issued. The court held that, as the assignor possessed the inchoate right to the exclusive use of the invention at the time he made the assignment, and had made the discovery and prepared the specification of the patent, and as the assignment was intended to operate upon the perfect legal title which the inventor then had a right to obtain, because it requested that the patent might issue to the assignee, there was no sound reason for restraining the assignment to the inchoate interest and requiring a further transfer of the patent. In the present case, the patent had been allowed and ordered to issue before the assignment was made, and the assignment refers to that fact, and to the fact that the purchase is of all the right, title and interest of Heath in the invention "in consequence of the grant of letters patent therefor." The defendant does not set up any right derived from Decker. Under the above decision it must be held that when the patent issued to Heath the legal right to the property it created became vested in the company on the recording of the assignment to it.

The plaintiff is entitled to the usual interlocutory decree for an account and a perpetual injunction.