## UNITED STATES v. HOUGHTON.

District Court, D. Maryland.    June 11, 1927.

No. 876.

1. Master and servant ⊜⟶62—Invention made by employee hired to make it belongs to employer.

Where an employee undertakes by direction of his employer to solve a specific problem, and the solution constitutes a patentable invention, the invention belongs to the employer.

2. Master and servant ⊜⟶62—Patent for fumigant and process of fumigation held property of United States.

The Houghton patent, No. 1,521,537, for a fumigant and process of fumigation for fumigating ships, etc., is for a discovery or invention made by the patentee while employed as a research chemist in the Public Health Service and under express assignment by the Surgeon General to experiment with a view to the production of a fumigant in which safety should be promoted by adding a warning constituent to the hydrocyanic acid gas, which he effected, with the co-operation of other employees, by a combination of the poisonous gas with cyanogen cloride, a tear gas. Held, that the invention and patent were the property of the United States.

3. Master and servant ⊜⟶62—Invention by government employee held "property of United States."

Where a government employee was directed by his superior to make tests for the purpose of finding a liquid solvent for fumigation gases, with the express understanding that any discovery made should be on behalf of the United States and not himself, to which he agreed and conducted experiments while on duty, he cannot claim the right to a patent for the result on the ground that the invention was perfected while he was on leave.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Property of the United States.]

In Equity. Suit by the United States against Harry W. Houghton. Decree for the United States.

John G. Sargent, Atty. Gen., Herman J. Galloway, Asst. Atty. Gen., Harry E. Knight and Henry C. Workman, Sp. Asst. Attys. Gen., for the United States.

Steuart & Steuart, of Washington, D. C. (Joseph W. Hazell and Francis B. Leech, both of Washington, D. C., of counsel), for defendant.

SOPER, District Judge. The United States, by its bill of complaint, seeks an injunction against Harry W. Houghton to restrain him from assigning to another certain inventions or letters patent pending the further order of the court, and also to secure a decree adjudging that the United States is entitled to the entire right, title, and interest therein, and that he be ordered to transfer and convey the same to the United States, and to make discovery of all applications for letters patent filed by him since 1921 for inventions or improvements made by him in connection with his services and duties in the Public Health Service. The inventions are covered by United States patent, No. 1,521,537, granted to Houghton December 30, 1924, and by his patent application, No. 745,251, filed October 22, 1924.

[1, 2] The inventions relate to fumigant and process of fumigation, for the purpose of exterminating objectionable insects, rodents. and other animals from ships, buildings, and other inclosures. Among the objects of the inventions is to produce a fumigant sufficiently destructive and poisonous, and at the same time to combine a warning gas with it, so as to give notice of its presence. A combination of hydrocyanic acid gas with cyanogen chloride gas was found satisfactory. The former is a poisonous gas, invisible, tasteless, and without odor, while the latter is a lachrymatory gas, causing intense irritation of the eyes.

The defendant, Harry W. Houghton, is a trained chemist holding a degree from a university. He was employed from July 16, 1902, to May 25, 1920, in the Bureau of Chemistry of the Department of Agriculture, in various capacities from laboratory helper to assistant chemist. On May 7, 1920, he applied for transfer in that capacity to the United States Public Health Service of the Treasury Department. The Public Health Service seconded his request, stating that his qualifications particularly fitted him to undertake special research work then being conducted in the Office of Industrial Hygiene and Sanitation. The transfer was authorized on June 29, 1920. He was assigned to duties in the hygiene laboratory of the Public Health Service, under the charge of the director of the laboratory, and for nearly two years was engaged in the analysis of dust samples—that is to say, samples of air taken from various industrial plants, with a view of determining whether the air contained substances likely to menace the health of industrial employees.

The work on the project, which resulted in the inventions in suit, had begun before Houghton was assigned to the Public Health Service. Dr. Hugh S. Cummings, of the Service, had been on duty in Europe in 1919 and 1920 in connection with welfare inspection of returning troops and immigrants to the United States. His attention had been

directed to fatalities caused by fumigation of ships with hydrocyanic acid gas, and he had given consideration to a method of making the gas safe by adding thereto a warning constituent, such as the lachrymatory gases used in the Great War. On March 10, 1920, he was appointed Chief of the Public Health Service with the title of Surgeon General, and subsequently conferred with his assistants upon the same project. Prior to August 5, 1921, he took up the matter with the Chemical War Service of the War Department as well as with the Department of Agriculture and the Department of the Interior. On October 28, 1921, he requested the Chemical Warfare Service to make an investigation at its laboratory at Edgewood Arsenal, in Maryland, of the practicability of generating fumes of chloracetophenone, a tear gas, simultaneously with the evolution of hydrocyanic acid gas. The laboratory reported results, and later a trial in practical ship fumigation was made at the Quarantine Station at New Orleans, but the process was found to be impracticable.

It was at or about this time that Houghton first began work upon the proposition. In the course of his duties as assistant chemist, he was instructed by Dr. Lewis R. Thompson, the official in charge of the Office of Industrial Hygiene and Sanitation, to study the technical literature relating to fumigation, and brought to Dr. Thompson's attention an article in a German publication entitled "Hydrocyanic Acid Derivatives for the Combating of Noxious Animals." Information was also obtained from other sources. Dr. Thompson took up with the Chemical Warfare Service an investigation of certain irritant gases, particularly the hydrocyanic acid derivatives, cyanogen chloride and cyanogen bromide, and on or about February 3, 1922, the officials at the Edgewood laboratory were directed to investigate the practicability of substituting cyanogen bromide, one of the cyanogen derivatives belonging to the same haloid group as cyanogen chloride, for hydrocyanic acid gas.

On or about March 1, 1922, the Surgeon General appointed a board, under his own control, to carry on the investigation, consisting of Dr. Thompson, as chairman, the defendant, Houghton, and Stephen Olop, an engineer in the Public Health Service. The board was directed to investigate methods of artificial ventilation of vessels subsequent to fumigation by cyanide gas, and to make studies as to the utilization of gases other than hydrocyanic acid gas, including an investigation as to the use of bromocyanogen in generating hydrocyanic acid gas. It was clearly understood by Houghton at the time that the special duty of the board was to adopt a method of fumigation which would involve the use of a lachrymator as readily prepared and as toxic as hydrocyanic acid, and possessing sufficient irritating properties to serve as a warning. He also understood that cyanogen chloride was one of the lachrymators which the board was expected to investigate and consider.

On March 27, 1922, the members of the board visited Edgewood Arsenal and conferred with technical employees and chemists of the Chemical Warfare Service, who had already been investigating the problem. Subsequently it was arranged that Houghton should conduct experimental tests in toxic and lachrymatory gases at the arsenal, where facilities were available. He arrived on May 8, 1922, and was informed as to all that had been accomplished in the meantime. Prior to his arrival, certain suggestions had been made as to the manner in which cyanogen chloride might be generated. After his arrival, the investigation was pursued jointly by him and three employees of the laboratory, to wit, H. C. Knight, J. F. W. Schulze, and C. P. Shingler. They experimented as to the amounts of the several reagents, the mode of manipulation, and composition of gas. It was finally decided that a plan suggested by Houghton was the only practicable one. It consisted of the use of sodium chlorate, sodium cyanide, and dilute hydrochloric acid, and it was found that the gas produced was a mixture of hydrocyanic acid and cyanogen chloride. During the progress of the experiments, Houghton continually reported results to Dr. Thompson, and received orders from him for experiments and investigations. The problem was finally solved on or about June 28, 1922. The result was eminently satisfactory. Thereby a practical fumigant possessing the lethal qualities of hydrocyanic acid gas was obtained, together with a warning gas which was properly diffused throughout the mixture and remained in place as long as, but no longer than, the poisonous constituent.

While it is admitted on all hands that certain other officials of the government co-operated in the investigation, it is not contended that Houghton is not entitled to credit for the discovery. Nor is it denied that the new fumigant constitutes a patentable invention. It is claimed, however, that the discovery, when made, was the property of the

United States, and that the United States has also the equitable title, and by the decree in this case should be granted the legal title, to the patent granted to Houghton over the protest of the government.

Upon these facts, the decision in Standard Parts Co. v. Peck, 264 U. S. 52, 44 S. Ct. 239, 68 L. Ed. 560, 32 A. L. R. 1033, is controlling. By a written contract in that case, Peck, the employee, agreed with his employer to devote his time to the development of a process and machinery for the production of a spring. He succeeded in inventing a device which became the subject of a patent. Suit was brought against the employer by the assignee of the patent for infringement, whereupon the employer defended on the ground that the invention belonged to it under the terms of the contract, and prayed that it be adjudged to have title to the patent. The Supreme Court said:

"By the contract Peck engaged to 'devote his time to the development of a process and machinery' and was to receive therefor a stated compensation. Whose property was the 'process and machinery' to be when developed? The answer would seem to be inevitable and resistless—of him who engaged the services and paid for them, they being his inducement and compensation, they being not for temporary use but perpetual use. * * *"

The Supreme Court approved the rule, enunciated by the District Court (295 F. 740), that if an employee be employed to invent a device or improvements in the machines with which he is connected, his patents therefor belong to his employer, since in making such improvements, he is merely doing what he was hired to do. The decision of the Circuit Court of Appeals, reported at 282 F. 443, was reversed. That court applied the rule, very generally accepted theretofore, that under a general contract of employment requiring an employee to devise such improvements as he can in the employer's machines, processes, or product, any patentable invention belongs generally to the employee, while the employer has a license to use it, unless there is an express agreement that the invention shall belong to the employer, and the court further held that this general rule should apply, although the employment was to devise or improve a specific thing subsequently discovered and patented. All that can be said for this rule was said by the Circuit Court of Appeals in its opinion; but the Supreme Court took the view that the law had been otherwise well settled by the cases

of Solomons v. U. S., 137 U. S. 342, 11 S. Ct. 88, 34 L. Ed. 667, and Gill v. U. S., 160 U. S. 426, 16 S. Ct. 322, 40 L. Ed. 480. In the former case the rule is stated as follows:

"If one is employed to devise or perfect an instrument, or a means for accomplishing a prescribed result, he cannot, after successfully accomplishing the work for which he was employed, plead title thereto as against his employer. That which he has been employed and paid to accomplish becomes, when accomplished, the property of his employer. Whatever rights as an individual he may have had in and to his inventive powers, and that which they are able to accomplish, he has sold in advance to his employer."

In the latter case the same rule was reaffirmed as follows:

"There is no doubt whatever of the proposition, laid down in Solomons' Case, that the mere fact that a person is in the employ of the government does not preclude him from making improvements in the machines with which he is connected, and obtaining patents therefor, as his individual property, and that in such case the government would have no more right to seize upon and appropriate such property, than any other proprietor would have. On the other hand, it is equally clear that, if the patentee be employed to invent or devise such improvements his patents obtained therefor belong to his employer, since in making such improvements he is merely doing what he was hired to do."

It is not necessary to decide in this case whether the employer acquires title to inventions made by an employee in the course of a general employment to improve the machinery or process of the employer, for Houghton was directed to solve a specific problem. It is conceded that he was officially called upon to discover and develop a fumigant that would answer the purpose of the Public Health Service.

The only way in which the defendant distinguishes his case from Standard Parts Co. v. Peck is on the ground that, whereas Peck was expressly employed to develop a particular process, Houghton was employed generally as a research chemist, and was subsequently assigned to work out a particular problem. It has been held by recent decisions of the District Courts in Texas Co. v. Gulf Refining Co., 13 F.(2d) 873, and Goodyear Tire Co. v. Miller, 14 F.(2d) 776, that the setting of a general employee to do a specific work will not create a title of his invention in his employer, in the absence of an agreement to that effect.

These decisions, although subsequent to Standard Parts Co. v. Peck, evince the same reluctance as was shown by many of the courts before it, to apply the ordinary rule of a contract of employment when an employee has discovered something having the dignity of an invention. But the broad principle is now laid down by the Supreme Court, too clearly to be misunderstood, that, when an employee merely does what he is hired to do, his successes, as well as failures, belong to his employer. Nor can it be said that one who willingly carries out the orders of his employer is not engaged upon that which he is employed to do. An employee, who undertakes upon the direction of his employer to solve a specific problem within the scope of his general employment, is as truly employed and paid for the particular project as if it had been described at the outset in the contract of employment. That which Houghton discovered belongs to the United States.

The Act of March 3, 1883 (22 Stat. 625 [Comp. St. § 9441]), has been referred to. It authorizes the grant of patents to any officer of the government, except Patent Office employees, without the payment of any fee, when the patented invention is to be used in the public service, provided that the applicant shall state in his application that his invention may be used by the government or any of its officers or employees in the transaction of work for the government or by any other person in the United States. Considerable diversity of opinion has arisen among the law officers of the United States as to whether this statute means that a patent obtained thereunder may be used, not only by the government, but by any other person in the United States, or that the dedication is only to the government, its officers, or employees, or any other like person in the public service. See the opinion of District Judge Knox, September 3, 1924, in Squier v. American Telephone & Telegraph Co., affirmed on appeal (C. C. A.) 7 F.(2d) 831. This legislation is immaterial here, because Houghton did not avail himself of the provisions of the statute, but filed his application under the general patent statutes and paid the usual fees. The statute was obviously enacted to make available the services of the Patent Office without compensation to inventors in the public service. It was not intended to deprive the United States of any rights to an invention which, except for the act, would have existed.

That which has been set out represents substantially the situation between the par-

ties prior to the discovery of the invention. The defendant, however, says that consideration should also be given to actions of various officials of the government which took place after the invention was made, as throwing some light upon the intention of the parties as to the ownership of inventions and patent rights when the work was first undertaken. Immediately after the discovery, namely, on June 29, 1922, Houghton took up the question with his superior officers as to the advisability of patenting the method as a matter of protection until publications could be issued. He was instructed by his superiors to work in harmony with the Chemical Warfare Service in the matter of applying for a patent. He wrote to the Commissioner of Patents, inquiring as to the right of an employee of the Public Health Service to obtain a patent, and received a reply referring him to the Act of March 3, 1883, supra.

About this time some question arose between Houghton and the employees of the Chemical Warfare Service, who had co-operated in the investigation, as to how credit for the discovery should be apportioned. It was suggested that the patent should be taken out in the joint names of Houghton and one or another of the officers at the laboratory. An arrangement was made with a patent attorney, with the consent of the Surgeon General, for the preparation of such a patent application. The attorney was of the opinion that Houghton should file the application in his own name as the sole inventor, and suggested the assignment by him of a one-fourth interest each, to Knight, Schulze, and Shingler. Drafts of an application and of a license to the United States to use the invention in this and foreign countries were prepared.

Later, on November 4, 1922, Houghton asked permission of the Surgeon General to file the application. Thereupon the opinion of the Solicitor of the Treasury Department was requested, but before it was forthcoming Houghton filed an application in his name for the patent, together with a nonexclusive license to the United States. Shortly after the application was filed, the employees of the Arsenal executed an agreement dedicating their rights to the public. On December 22, the opinion of the Solicitor of the Treasury was filed, which declared that the sole title to the invention resided in the United States. In January and February, 1923, the Surgeon General filed a protest with the Commissioner of Patents to prevent favor-

able action upon the Houghton application. In February, 1924, a conference of the parties who had co-operated in the work was called and Houghton consented to assign the invention to the United States; but in March he withdrew his assent. In May, 1924, he filed a power of attorney to new counsel in the Patent Office, without the knowledge or approval of the Public Health Service, and stated that his application was a continuation of the former application, which he intended to permit to lapse. After the new application had been filed, the Surgeon General again protested to the Patent Office against the grant of the patent to Houghton, but the protest was overruled and the patent was issued December 30, 1924.

It can hardly be said that the facts outlined throw any light upon the intention of the parties at the time the investigation was begun, or impair the rights acquired by the solution of the problem. There was considerable diversity of opinion amongst the various officials and lawyers consulted as to the legal rights of the parties, and certain changes of position on the part of Houghton as to whether he would claim full title to the invention or surrender it to the public; but it is certain that none of the officials had the authority to give away the property of the United States, and that Houghton on his part did not surrender his claim to full title in the invention. In short, the case as to the patent must be decided upon the facts as they existed at the time that the discovery was made.

[3] It is necessary to add but little in regard to the ownership of the invention involved in the pending application in the Patent Office. As early as March, 1922, the Public Health Service had under consideration the production of a fumigant including cyanogen chloride in liquid form. The matter was under investigation again in the following year, during which Houghton made certain tests. In September and October, 1924, Houghton was directed by the Surgeon General to make investigation to ascertain whether the cyanogen chloride gas mixture could be absorbed into some liquid medium, such as carbon tetrachloride or acetone, to avoid the risk of fire, and to avoid the transportation of apparatus and material required to generate it. Houghton was cautioned that the bureau was dissatisfied with his attitude in respect to the patent that had been filed, and that he was clearly to understand that he was employed on behalf of the government to develop and perfect methods of

fumigation and improvements and to develop ideas thought out by the Public Health Service, and that he was not to apply for a patent on the results of the investigation. To all of this Houghton agreed.

During September and October, he experimented with water and glycerine as an absorbent, and on October 22, 1924, without the knowledge of his superiors, he filed an application for letters patent covering such process. On November 26, 1924, he reported to the Surgeon General that certain experiments had been made to improve the cyanogen chloride method of ship fumigation, by producing a noninflammable liquid preparation. He said that the first preparation which gave promise consisted of water and glycerine saturated with the cyanogen chloride gas mixture, and that, continuing the experiments, there had been found a preparation consisting of carbon tetrachloride and acetone, which absorbed the fumigating gas mixture satisfactorily. These improvements, he said, should be protected at once, and he therefore requested that permission be granted to file an application for a patent fully protecting the government in all its branches. Permission was refused him, except on the condition that he would execute an assignment thereof to the government. On January 12, 1924, demand was made upon him to assign his patent, No. 1,521,537, but he refused to do so. On February 17 demand was made that he assign the invention for the improvements, which he also refused. On March 7, 1925, he was directed by the Surgeon General to inform the bureau as to what steps had been taken in the matter of prosecuting the application for letters patent covering the improvements, whereupon he replied that no application had been filed by him for the preparation containing carbon tetrachloride and acetone, but that he had filed the application of October 22, 1924, "for improvements developed * * * while on leave during * * * detail at the Boston Quarantine Station." He offered to grant a license to the United States to make use of the invention.

It is thus clear that Houghton formally agreed that such discovery as should result from the additional investigation would be made on behalf of the United States. His only possible defense, therefore, under any view of the law, is his statement that he developed the glycerine and water process while on leave. This is an insufficient reply. The discovery was within the purview of the investigation upon which he was employed. He

formally reported experiments with glycerine and water which led to the invention. It is stipulated in the case that experiments in the process were made during the months of September and October, and that during portions of these months he was on duty; so that from the record it would appear that his experiments were performed, even if his final results were not achieved, while he was officially employed. In any event, having agreed in advance that he would investigate for the benefit of the United States a suggestion of his superior officers, he cannot evade his obligation by developing it while on leave. See Gill v. United States, 160 U. S. 426, 433, 16 S. Ct. 322, 40 L. Ed. 480. The invention and the patent application covering it are the property of the United States.

A decree will be signed in accordance with this opinion.