## UNITED STATES v. DUBILIER CONDENSER CORPORATION
### (three cases).
### Nos. 788–790.

District Court, D. Delaware.
April 27, 1931.

Leonard E. Wales, U. S. Atty., of Wilmington, Del., Charles B. Rugg, Asst. Atty. Gen., Alexander Holtzoff and A. Blaine York, Special Assts. to Atty. Gen., and Frank J. Keating, of Washington, D. C.

James H. Hughes, Jr., and E. Ennalls Berl (of Ward & Gray), both of Wilmington, Del., and John B. Brady, of Washington, D. C., for defendant.

NIELDS, District Judge.

Francis W. Dunmore and Percival D. Lowell were employed by the United States in the Radio Section of the Bureau of Standards. While so employed, they conceived the idea of using ordinary house-lighting alternating current in the operation of radio apparatus and of means for eliminating hum caused by the alternations of such current; and they made certain inventions embodying the idea. Upon applications filed in the United States Patent Office, three patents issued: No. 1,455,141 to Percival D. Lowell and Francis W. Dunmore for "Improvements in Radio Receiving Apparatus"; No. 1,606,212 to Francis W. Dunmore and Percival D. Lowell for a "Power Amplifier"; and No. 1,635,117 to Francis W. Dunmore for a "Signal-Receiving System." The patentees granted an exclusive license under each of the three patents to the defendant, Dubilier Condenser Corporation, but excepted from such license a nonexclusive personal nontransferable license to the United States for governmental purposes under each patent. The United States is not content with such licenses and seeks in these three suits (tried together) to obtain a decree compelling the defendant to convey to the United States all defendants' right, title, and interest in the patents.

Title to the patents in suit is the issue in these cases. Their validity has been adjudicated by this court. Dubilier Condenser Corp. v. Radio Corp. of America, 34 F.(2d) 450. The United States claims title apparently on the theory that the chief of the Radio Section of the Bureau of Standards assigned to the patentees, Dunmore or Lowell, or to both of them, as research workers in the laboratory of the Radio Section of the Bureau, the problems of devising apparatus for operating a radio receiving set, a radio loud-speaker, and a radio relay by the use of ordinary house-lighting alternating current with the hum eliminated, and that the apparatus covered by the patents in suit was devised by Dunmore or Lowell, or both of them, at the laboratory of the Radio Section during the usual hours of work, and by the use of tools and facilities of the United States, pursuant to the instructions and directions of the chief of that section. In other words, the United States claims that the

inventions covered by the three patents in suit, being the product and the result of the work of employees of the United States in solving radio research problems assigned to them by their superior in the course of their employment, became ipso facto and are the property of their employer, the United States. The defendant, on the other hand, asserts that there was no written or oral agreement on the part of the patentees to convey any patents devised in the course of their employment to their employer; that the character of their employment raised no implication of an agreement to convey patents; that there was no assignment by any superior of Lowell and Dunmore, or of either of them, of a problem, or problems, involving the inventions covered by the patents in suit; and that no duty rested upon the patentees to convey their patents to their employer, even though to perfect their inventions they used their employer's property, received the assistance of others in their employer's pay, and took time which should have been given to their employer's business, their employer, the United States, being fully compensated in this regard by a nonexclusive license under the patents.

The Bureau of Standards is a subdivision of the Department of Commerce of the United States. Its functions consist in the custody of standards; the comparison of the standards used in scientific investigations, engineering, manufacturing, commerce, and educational institutions with the standards adopted or recognized by the government; the construction of standards, their multiples and subdivisions; the testing and calibration of standard measuring apparatus; the solution of problems which arise in connection with standards; and the determination of physical constants and the properties of materials. In addition, the Bureau of Standards, during the years hereinafter referred to, was charged by Congress with the duty of investigation and standardization of methods and instruments employed in radio communication, for which work Congress made special appropriations. Act of March 3, 1901, 31 Stat. 1449, U. S. Code, title 15, §§ 271–281 (15 USCA §§ 271–281); Act March 4, 1915, 38 Stat. 1044; Act May 29, 1920, 41 Stat. 682, 684; Act March 3, 1921, 41 Stat. 1301, 1303. In recent years the Bureau of Standards has been engaged in research and testing work of various kinds, for the benefit of private industries, other departments of the government, and the general public.

The Bureau of Standards is divided into divisions, each charged with a specified field of activity. One of such divisions is the Electrical Division. The various divisions are further subdivided into sections. One of the sections of the Electrical Division is the Radio Section. In 1921 and 1922 the employees in the laboratory of the Radio Section numbered approximately twenty technical men and a number of draftsmen and mechanics. The technical men were engaged in testing radio apparatus and methods and in radio research work. They were subdivided into ten groups, each group having a group chief. In outlines of radio work by the chief of the section, or alternate chief, the work of each group was defined.

In the years 1921 and 1922, Francis W. Dunmore and Percival D. Lowell were employees of the Radio Section and were engaged in research and testing in the laboratory of the section. In the outlines of laboratory work the subject of "Airplane Radio" was assigned to the group of which Dunmore was chief and Lowell a member. The subject of "Radio Receiving Sets" was assigned to a group of which J. L. Preston was chief, but of which neither Lowell nor Dunmore was a member. From January 14, 1918, to the date of filing the bills of complaint in this case, Dunmore was employed in the Radio Section in the successive capacities of laboratory assistant, assistant physicist, and associate physicist, at annual salaries of $1,320, $1,500, $1,680, $1,980, $2,100, and $2,400. Between February 4, 1913, and July 15, 1922, Lowell was employed in the Radio Section in the successive capacities of laboratory apprentice, aid, laboratory assistant, and assistant physicist, at annual salaries of $480, $540, $600, $720, $900, $1,000, $1,200, $1,320, $1,500, $1,800, and $1,980.

In May, 1921, the Air Corps of the Army and the Bureau of Standards entered into an arrangement whereby the latter undertook the prosecution of forty-four research projects for the benefit of the Air Corps. To pay the cost of such work, the Air Corps transferred and allocated to the Bureau the sum of $267,500. Projects Nos. 37 to 42, inclusive, relating to the use of radio in connection with aircraft, were assigned to the Radio Section, and $25,000 of the total amount was allocated to pay the cost of the work. Project No. 38 was styled "Visual Indicator for Radio Signals," and suggested the construction of a modification of what was known as an "Eckhardt Recorder." Proj-

308

ect No. 42 was styled "Airship Bomb Control and Marine Torpedo Control." Both projects required the design of a radio relay; that is, of a mechanism, for use on an airplane to receive the output from a radio receiver and to relay it to a coil on the airplane, which would operate either a visual indicator or a trigger, such trigger to release a bomb on a pilotless plane or a marine torpedo. The relay for the trigger was to operate at the rate of from 10 to 12 times per second upon a current of 500 microamperes.

In the spring of 1921, the Signal Corps of the Army allocated to the Bureau between $10,000 and $20,000 for radio research on several specific problems, including the design of a suitable relay for use of the Air Corps, already comprised in aircraft projects Nos. 38 and 42.

In the summer of 1921, Dunmore, being chief of the group to whom "Airplane Radio" problems had been assigned, without further instructions from his superiors, picked out for himself the above-mentioned problem of operating a relay "at the rate of from 10 to 12 times per second upon a current of 500 microamperes * * * as one of particular interest and having perhaps a rather easy solution, and worked on it." In September, Dunmore solved this problem by substituting two tubes for two coils in the recording apparatus devised by Dr. Eckhardt, and called the relay "Type A Relay." This relay was supplied with power by direct current from a battery aboard ship. The above problem dealt with remote control of bomb on airship and torpedo in the sea.

In the midst of aircraft problems and numerous routine problems of the section, Dunmore was wrestling in his own mind, impelled thereto solely by his own scientific curiosity, with the problem of substituting house-lighting alternating current for direct battery current in radio apparatus. He conceived the idea of obtaining a negative bias on the grid of an electron tube from alternating current, and tested his idea by substituting a power pack generating alternating current, together with his new apparatus, in a type A relay, in place of the battery. This substitution gave him a relay for operating a telegraph instrument, but was in no way related to the remote control relay devised for aircraft use. The conception of applying alternating current related particularly to broadcast reception. Dunmore describes the conception in the following words: "After our work on elimination of

batteries for broadcast reception was started, I had available a power supply unit which [I] connected on to the Type A Relay, eliminating the use of batteries, with the Type A, and later when I put the Type A Relay and the power unit in the same box, I gave it the name of a Type B Relay, but it was nothing more than a Type A Relay with a power pack in the box to operate the Type A Relay without batteries." The idea of obtaining a negative grid bias for an electron tube from alternating current was conceived by Dunmore on August 3, 1921, and he reduced the invention to practice on December 16, 1921. In the early part of 1922, Dunmore advised his superior of his invention and spent additional time in perfecting the details. Later he constructed two type B relays for the Signal Corps of the Army. Detailed drawings for the finished form of type B relay were prepared during office hours by a draftsman employed at the Bureau, and the apparatus was constructed from government material by mechanics employed at the shop of the Bureau during office hours. Dunmore's work on type B relay was reflected in his official reports and notebook. He described both types A and B relays in an article, approved by the Bureau, and published in the Journal of the American Institute of Electrical Engineers. February 27, 1922, Dunmore filed an application for a patent for a signal receiving system, and on July 5, 1927, patent No. 1,635,117 was issued.

In 1919 or 1920 the Radio Section had developed a radio transmitting apparatus supplied with power by alternating current instead of batteries, which was described in a Bureau publication. A transmitting apparatus is unlike a receiving apparatus, and, in particular, does not involve the question of the elimination of hum produced by the use of alternating current. In the fall of 1921 both Dunmore and Lowell were considering the problem of applying alternating current to broadcast receiving sets. This project was not involved or even suggested by the problems with which the radio section was then dealing and was not assigned by Dr. Dellinger or by any other superior as a task to be solved by either of these employees. It was a project independent of their work, and was voluntarily assumed.

While performing their regular tasks, Dunmore and Lowell experimented at the laboratory in devising apparatus, including a transformer, rectifier, resistors, and condenser, for the purpose of operating a radio receiving set by alternating current with the

hum incident thereto eliminated. The invention of this radio receiving apparatus, covered by patent No. 1,455,141, was completed by Dunmore and Lowell on December 10, 1921, as appears in Dunmore's notebook under that date. The claims of the patent can readily be read on the 'diagram appearing in his notebook under that date. The receiving set was heard in successful operation prior to Christmas, 1921, and during the Christmas holidays. Before the completion of this invention on December 10, 1921, no instructions were received and no conversations were held by these employees with Dr. Dellinger, the head of the Radio Section, or with any superior in the Bureau relative to the invention. On January 9, 1922, Dr. Dellinger came to the room of Dunmore and Lowell in the laboratory and asked Lowell what he had been doing. In answer, Lowell wrote a memorandum about his work on the high frequency bridge and the receiving set operated by alternating current. Thereupon Dr. Dellinger requested a detailed report of Mr. Lowell's work on both the high frequency bridge and the receiving set. At no stage does it appear that Dr. Dellinger contributed any suggestions. Thereafter Lowell did engineering work in refining and perfecting the receiving set apparatus, but nothing new was added to the invention of December 10, 1921. Detailed drawings were prepared during office hours by a draftsman employed at the laboratory, following instructions of Lowell and Dunmore, and the apparatus was built out of government material. Lowell described the development of this radio receiving set in a technical paper published by the Bureau of Standards October 2, 1922, entitled "An Electron Tube Amplifier Using 60-Cycle Alternating Current to Supply Power for the Filaments and Plates." March 27, 1922, Lowell and Dunmore filed an application for a patent for "Radio Receiving Apparatus," and on May 15, 1923 patent No. 1,455,141 was issued.

Dunmore and Lowell also conceived the invention of energizing a dynamic type of a loud-speaker from an alternating house-lighting circuit and reduced the invention to practice on January 25, 1922. In the technical paper mentioned above, Lowell described this invention. March 21, 1922, Dunmore and Lowell filed an application for a "Power Amplifier," and on November 9, 1926, patent No. 1,606,212 was issued. The invention embodied in this patent was devised by the patentees without suggestion, instruction, or assignment from any superior.

In June and July, 1922, Dr. Dellinger made demands on Dunmore and Lowell that they assign the applications for the above-recited patents to the United States. These demands were refused. Afterwards a representative of the Attorney General of the United States made a similar demand on Dunmore and Lowell, which was refused. Before making the applications for the patents, no one advised Dunmore or Lowell that they would be expected to assign exclusive rights in their inventions to the United States.

October 20, 1924, Lowell and Dunmore granted to the defendant, Dubilier Condenser Corporation, an exclusive license under letters patent No. 1,455,141, subject to a nonexclusive license in the United States to use the invention without royalty for the full term of the patent.

May 19, 1927, Dunmore and Lowell granted to defendant an exclusive license under letters patent No. 1,606,212, subject to a nonexclusive license in the United States.

July 15, 1927, Dunmore granted to the defendant an exclusive license under letters patent No. 1,635,117, subject to a nonexclusive license in the United States.

It is well settled that the government as an employer has no greater right to inventions made by its employees than other employers. It is conceded that there was no express contract between the two employees and the United States that patents covering inventions made by the employees during their employment should belong to the employer. It is difficult to gather from the briefs and argument whether the United States relies on the law of contracts or the law of master and servant, or on both, to support its contentions. Apparently the government is seeking to enlarge the scope of the duties which an employee owes to his employer respecting patents. The government claims to find support for its positions in the cases of Solomons v. United States, 137 U. S. 342, 11 S. Ct. 88, 89, 34 L. Ed. 667; Standard Parts Co. v. Peck, 264 U. S. 52, 44 S. Ct. 239, 68 L. Ed. 560, 32 A. L. R. 1033; and Houghton v. United States (C. C. A.) 23 F.(2d) 386, 388, affirming (D. C.) 20 F.(2d) 434.

In Solomons v. United States, Clark, while Chief of the Bureau of Engraving and Printing, was assigned the task of devising a self-canceling revenue stamp. He devised a stamp which the Treasury adopted. Later he obtained a patent, and an infringement

suit was brought against the United States. The only question involved in the case was the right of the United States to use the stamp without paying royalty. Title to the patent was in no way involved. The court divided the master and servant situation into two classes: First, whether a license to the master may be inferred from the facts where there is only a general employment; and, second, where there is a specific hiring to devise an improvement, the master's rights in any resulting invention arise as a matter of law. The extent of such rights, beyond a license, was not involved in the case. Mr. Justice Brewer, speaking for the court, said: "An employee, performing all the duties assigned to him in his department of service, may exercise his inventive faculties in any direction he chooses, with the assurance that whatever invention he may thus conceive and perfect is his individual property. There is no difference between the government and any other employer in this respect. But this general rule is subject to these limitations: If one is employed to devise or perfect an instrument, or a means for accomplishing a prescribed result, he cannot, after successfully accomplishing the work for which he was employed, plead title thereto as against his employer. That which he has been employed and paid to accomplish becomes, when accomplished, the property of his employer. Whatever rights as an individual he may have had in and to his inventive powers, and that which they are able to accomplish, he has sold in advance to his employer. So, also, when one is in the employ of another in a certain line of work, and devises an improved method or instrument for doing that work, and uses the property of his employer and the services of other employees to develop and put in practicable form his invention, and explicitly assents to the use by his employer of such invention, a jury, or a court, trying the facts, is warranted in finding that he has so far recognized the obligations of service flowing from his employment and the benefits resulting from his use of the property, and the assistance of the co-employees, of his employer, as to have given to such employer an irrevocable license to use such invention."

The only application of the above authority to the facts in this case is the recognition of the patentees' title to their own inventions, subject to a nonexclusive license in the government.

The primary question in the case of Standard Parts Co. v. Peck was the legal effect of an express contract. Peck, a designer of machinery and a patent attorney, had expressly agreed to devote his time to the development of machinery for the production of an automobile spring. He proceeded under his contract and developed a machine satisfactory to his employer. Peck patented his invention and sued his employer for infringement. That this case has no bearing on the question under consideration is quite apparent from the statements of Judge Westenhaver ([D. C.] 295 F. 740, 745) sustaining the right of the employer to the Peck invention. He said: "In this case plaintiff was employed for a specific purpose. He had no general employment, and performed no services, except in that one capacity. The entire consideration received by him was paid in developing the process and machinery which has eventuated in a patentable invention. He was not employed generally in a certain line of work, and devised merely an improved method or instrument for doing that work. He was employed and paid to develop a process or machinery or means of accomplishing a prescribed result. The patentable invention is the result solely of that which he was employed and paid to accomplish. The results thus accomplished, even if of a patentable nature, should accrue wholly to the employer; otherwise, the employer is deprived of a part of that for which he has paid. No invention ever would have been made, except for this contract of employment and expenditure of the employer. The employee, it seems to me, has sold in advance whatever rights as an individual he may have had in and to his inventive powers, so far as they relate to the work he was to do or the results which he accomplished."

The Supreme Court, in affirming Judge Westenhaver, recognized that the interpretation of an express contract was the vital point of the case, and held that an invention of a specific thing may be made the subject of a bargain, and that such was the object and effect of Peck's contract.

The remaining authority relied upon by the government is the case of Houghton v. United States, in the Circuit Court of Appeals for the Fourth Circuit. That case is quite different from the instant case. Houghton was a trained chemist employed by the Bureau of Chemistry in the Department of Agriculture. The Public Health Service of the Treasury Department had him transferred and assigned to duties in the hygiene laboratory of that service to devise or discover a safe fumigant. Work on the project which resulted in the invention in suit had begun before Houghton was assigned

to the Public Health Service. The laboratory had reported results which proved impracticable. Houghton was instructed to study the technical literature relating to the subject. The Surgeon General appointed a board of three under his own control to carry on the investigation. Of this board Houghton was a member. During the progress of the experiments, Houghton continually reported to his superior and received orders from him for further experiments and investigations. The United States brought suit against Houghton, alleging that it was the equitable owner of the patent and entitled to an assignment thereof. The court said: "It is clear, we think, upon these facts, that the case presented is not the ordinary case of an invention made by an employee, who, while discharging the duties assigned to him in his department of service, conceives and perfects an invention. In such case the rule is that the invention is the property of the employee. * * * But the case here presented is that of an employee who makes a discovery or invention while employed to conduct experiments for the purpose of making it. Houghton did not conceive the idea of combining an irritant gas with hydrocyanic acid gas, so as to produce a safe fumigant. That was the idea of Dr. Cumming, the Surgeon General, under whom he was working. He did not conceive the idea of using cyanogen chloride gas as the irritant with the deadly gas. That idea had been advanced in a German periodical, and experiments and studies along that line had previously been conducted at the direction of the Health Service. All that he [Houghton] did was to take the idea of the Surgeon General, upon which the Health Service had been experimenting, and conduct experiments under its direction, for the purpose of determining how best to produce and combine the gases so as to achieve the result which the Surgeon General had in mind. * * * Under such circumstances, we think there can be no doubt that his invention is the property of his employer, the United States."

Counsel for the government lay much stress upon the following language of Judge Soper in the District Court [20 F.(2d) 434], quoted with approval by the Court of Appeals for the Fourth Circuit: "The broad principle is now laid down by the Supreme Court, too clearly to be misunderstood, that, when an employee merely does what he is hired to do, his successes, as well as failures, belong to his employer. Nor can it be said that one who willingly carries out the orders of his employer is not engaged upon that which he is employed to do. An employee, who undertakes upon the direction of his employer to solve a specific problem within the scope of his general employment, is as truly employed and paid for the particular project as if it had been described at the outset in the contract of employment."

No authority is cited in support of this statement, and I have been able to find none in the reported cases. But, even assuming that such statement is supported by authority, it has no application to this case because, as fully appears in the findings of fact, there was no assignment by Dr. Dellinger, or by any other superior to these two employees of the Radio Section of any research problem involving the inventions in controversy. The most that can be said is that Lowell and Dunmore were permitted by Dr. Dellinger, after the inventions had been brought to his attention, to pursue their work in the laboratory and perfect the inventions which had theretofore been made by them.

If the bill is to be sustained, resort must be had to the further position taken by the United States that, when an employee of the Radio Section, one of whose duties is to carry on research work, makes an invention within the field of his work, though without assignment from a superior, such an invention ipso facto becomes the property of the employer; or, stated differently, that all patents of research workers in the Radio Section of the Bureau of Standards belong to the United States. I am confident that no provision in the organic law creating the Bureau or in acts of Congress making appropriations to carry on its work, no well-considered authority or sound reason, can be found to support such a position.

The basis of the foregoing position, repeatedly emphasized both in argument and brief, seems to be the assumption that the research work of the Bureau of Standards is primarily concerned with invention. But there is nothing in the record to support this idea. While it is true that section 2 of the act (15 USCA § 272) creating the Bureau speaks of the "solution of problems which arise in connection with standards" and some of the appropriation acts refer to "investigation and standardization of methods and instruments employed in radio communication," these statutory provisions fall far short of converting the work of the Bureau or any section thereof into "inventive" work, as that word is usually understood. Had Congress any such intention, it ought to be

expressed in the clearest and plainest words, and should not be left to uncertain implications from duties and conduct. The Bureau was at times engaged in "research work." "Research" has been defined as the "endeavor to discover, to develop, and to verify knowledge," and "careful or critical inquiry or examination, in seeking facts or principles." While invention may and usually does presuppose research, research certainly does not usually involve or result in invention. To say that a person engaged in "research" work is necessarily engaged in "inventive work" is putting an unwarranted construction upon the word "research," not justified by common knowledge or experience.

Half the time of Dunmore and Lowell was occupied in testing work. The other half of their time was occupied in research work, normally invoking their skill, knowledge, and experience. By exercising those faculties within the field of work assigned to them these employees fully performed the duties owing to their employer. For an employee to go beyond such skill, invoke his inventive genius, and make a patentable invention, is the unusual and abnormal thing not incident to his general employment.

The Bureau of Standards has upon its staff a large number of employees engaged in specific fields of activity and to a certain extent engaged in research work. To hold that every invention made by one of these research workers under the facts disclosed in this case automatically became the property of the United States would, I think, be not only contrary to the law as laid down by the Supreme Court, but have a strong tendency to destroy the morale of the Bureau and take away a just incentive on the part of its employees to make inventions; that is, a personal reward for their efforts, bearing always in mind that the government is entitled to the full use of all such inventions.

In commenting upon the retirement of Dr. Samuel W. Stratton, formerly Director of the Bureau of Standards, President Hoover, then Secretary of Commerce, said:

"While the Massachusetts Institute of Technology is to be congratulated on securing Dr. Stratton, one cannot overlook the fact that the desperately poor pay which our government gives to great experts makes it impossible for us to retain men capable of performing the great responsibility which is placed upon them. The Institute of Technology, an educational institution, finds no difficulty in paying a man of Dr. Stratton's calibre three times the salary the government is able to pay him.

"Dr. Stratton has repeatedly refused large offers before, but the inability of the scientific men in the government to properly support themselves and their families under the living conditions in Washington and to make any provision for old age makes it impossible for any responsible department head to secure such men for public service at government salaries."

Under such conditions, should the normal reward of inventors be withheld from research workers in the Bureau of Standards? I think not. To do so would measurably crush the inventive genius, enthusiasm, and spirit of the employees. It would drive unusual men out of the public service and correspondingly lower the efficiency of the Bureau. If the rules of law heretofore prevailing are to be extended to bring about this result, resort should be had to the Congress and not to the courts.

The bills of complaint must be dismissed.